# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4899 | **DATE** | 9/12/2003 |
| **CASE TITLE** | Tracy Darnell Dobbs vs. Dr. Sood, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: The court grants defendants' motions for summary judgment [62-1, 64-1]. The Clerk is directed to enter judgment in favor of defendants Dr. Kul B. Sood, Dr. Olumuyiwa Idowu, Jim Utley, Monica Becker, Arthur Gillen, Samantha Franklin, James Burzinski, and Keith Lee, and against plaintiff Tracy Darnell Dobbs pursuant to Fed.R.Civ.P. 56. Defendants' Motion for enlargement of time to file reply to their motion for summary judgment [88-1] is denied as moot. Plaintiff's motion to admit a certain memo as evidence[104-1] is denied (see footnote 2 in Memorandum Opinion and Order).
(11) ■ [For further detail see order attached to the original minute order.]

No notices required, advised in open court.
No notices required.
Notices mailed by judge's staff.
Notified counsel by telephone.
✓ Docketing to mail notices.
✓ Mail AO 450 form.
Copy to judge/magistrate judge.

courtroom deputy's initials: TBK

date docketed: SEP 1 6 2003

Document Number: 105

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

TRACY DARNELL DOBBS, )
)
        Plaintiff, )
)
v. ) No. 01 C 4899
) Hon. Paul E. Plunkett
DR. SOOD, DR. IDOWI, WARDEN GILLEN, )
SUPT. UTLEY, MS. BECKER, SAMANTHA )
FRANKLIN, SGT. BRAWZINSKI, )
C/O LEE, C/O LACKEY )
)
        Defendants. )

**DOCKETED**
**SEP 1 6 2003**

## MEMORANDUM OPINION AND ORDER

Plaintiff, Tracy Darnell Dobbs, brings this complaint against two physicians, Dr. Kul B. Sood and Dr. Olumuyiwa Idowu, and officials at Joliet Correctional Center, Jim Utley, Monica Becker, Arthur Gillen, Samantha Franklin, James Burzinski, and Keith Lee,[1] under 42 U.S.C. §1983. He alleges violations of his constitutional rights while he was in custody at that institution. Defendants have filed motions for summary judgement, to which Dobbs has responded.[2]

For the following reasons, the motions for summary judgment are granted.

## I. Standard of Review

*Borcky v. Maytag Corporation*, 248 F.3d 691, 695 (7th Cir. 2001), details the criteria a district court must follow in ruling on a motion for summary judgment:

> [A district court] "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000). Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

---

[1] The court will use the correct spelling of defendants Idowu and Burzinski's names.

[2] After the motions were fully briefed, Dobbs filed a motion for admissible evidence, which consists of a memo, dated May 7, 1999. In it, Willard O. Elyea, the Medical Director, writes: "You were seen in Podiatry Clinic on a number of occasions. Although toenail surgery was suggested, there was never a recommendation for special shoes." Defendants objected noting that the memo concerns events before the time period of the complaint and not pertaining to any of the named defendants. The court agrees and denies Dobbs's motion.

/05

Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

However, "[t]he mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment," *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999); only a "genuine" issue of "material" fact precludes summary judgment, Fed. R. Civ. P. 56(c). "Factual disputes are 'material' only when they 'might affect the outcome of the suit under the governing law.'" *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 610 (7th Cir. 2001) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Furthermore, "[f]actual disputes are 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [nonmovant].'" *Id.* (*quoting Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505). Speculation will not suffice. *See Liu*, 191 F.3d at 796 ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion."); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999) (stating that a plaintiff's speculation is "not a sufficient defense to a summary judgment motion").

The party moving for summary judgment has the initial burden of submitting affidavits and other evidentiary material to show the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. Once the moving party has sustained the initial burden, the opposing party may not rest upon the mere allegations or denials of the pleadings, but instead must come forward with specific evidence, by affidavits or as otherwise provided in Rule 56, showing that there is a genuine issue for trial. *Id.* at 324.

Moreover, a party may not attempt to survive a motion for summary judgment through the submission of an affidavit that contradicts testimony in his deposition. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001).

## II. Facts

The facts, as stated by Dobbs in his complaint:

On January 19, 2000, Dobbs was seen by defendant Dr. Idowu, a physician at Joliet Correctional Center. Dobbs complained of pain and neuropathy, explaining that his feet occasionally bleed. He asked to have his toenails clipped to prevent possible infection and gangrene, stating that he had sensations of painful burning, freezing, and electrical shock in his left leg and foot. He also asked Idowu to issue a medical permit for an extra pillow, thermal clothing, socks, and a blanket to keep his limbs warm and to alleviate his pain. He explained that when he tied his shoes, he felt pain

in his left foot, and he asked for therapeutic shoes, physical therapy, and an appointment with a foot specialist. Idowu issued a low bunk/low gallery permit but refused his request to see a foot specialist. She said she would speak with prison officials about the pillow, shoes, and physical therapy. She apparently refused to order that anyone clip Dobbs's toenails.

On February 8, 2000, Dobbs again spoke to defendant Idowu and counselor Shelly about his condition and was referred to defendant assistant warden Gillen and a health care administrator. Again, Dobbs did not receive the items he had requested.

On February 15, 2000, Dobbs asked defendant Correctional Officer Lee for help, showing Lee blood on his toes and his shoes and socks. Dobbs was concerned about possible infection because he could not feel his sharp toenails cut into his flesh. He requested immediate medical treatment. Lee told Dobbs that defendant Sgt. Burzinski had told Lee to tell Dobbs to put in a sick call slip. Two officers were witnesses to this report and to the bleeding of Dobbs's toes. On the same day, Dobbs explained his situation to defendant prison guard Lackey, showing Lackey his blood-stained socks, and telling Lackey of the pain his foot was causing. Dobbs asked Lackey to call someone to get medical care for Dobbs, but Dobbs "never received any medical treatment."

Also on February 15, 2000, defendant superintendent Utley and another official made rounds in Dobbs's unit and observed him with his foot wrapped in a rug. He explained his situation, but was told that he could not wrap his foot in a rug. Utley told him that Utley would get him "a special shop for medical needs, once [that was] recommended by doctors." Dobbs explained that several doctors had already recommended thermal clothes, an extra blanket, and socks, but his medical records had been lost when he was transferred from Menard to Joliet. He stated that he had inquired about this medically prescribed apparatus, and asked Utley to look into this matter. He was never notified whether Utley looked into it. Dobbs spoke to Utley at least two other times about his situation, and each time Utley stated that he needed to see medical records with doctors' recommendations before he could do anything.

On February 19, 2000, Dobbs saw defendant medical director Dr. Sood and requested the medical treatment that had been recommended in the past by a Dr. Schwarz, but Dr. Sood denied it without examining Dobbs, stating that it had been some time since that treatment had been approved.

On February 29, 2000, Dobbs asked defendant Idowu "to follow the same procedure as Dr. Schwarz" because the weather was causing him excruciating pain. She denied this request. Dobbs asked her to speak with a Lt. West, who was right outside her office, to provide Dobbs with a blanket, but she refused.

Defendant Gillen received a letter from Dobbs dated March 20, 2000, describing Dobbs's problems and requesting items needed to treat Dobbs, but Gillen refused the request without consulting the physicians or others. Defendant clinical services supervisor Samantha Franklin received a similar letter, but Franklin also refused to help him.

On April 11, 2000, defendant Idowu reinstated the low bunk/gallery permit. Dobbs again requested a blanket. Idowu responded: "I don't have to give you anything." This time defendant Supt. Utley, as well as Lt. West, were right outside. Dobbs asked Idowu to speak to them, but she refused.

Dobbs states additional information in a "Note" appended to his complaint. The information in this note contains names of "witnesses" and is largely duplicative of the other statements in his complaint. Dobbs adds, however, that his symptoms stem from a spinal injury caused by a gunshot wound to his lower back in 1987-88.

### III. Analysis

#### A. Exhaustion of Administrative Remedies

Defendants argue that Dobbs did not exhaust his administrative remedies before he lodged this action.

Exhaustion of administrative remedies, pursuant to the Prison Litigation Reform Act, is required for all prisoner suits seeking redress for prison circumstances or occurrences, regardless of whether they involve general circumstances of incarceration or particular episodes, and whether they

allege Eighth Amendment violations based on use of excessive force or some other wrong. *Porter v. Nussle*, 534 U.S. 516 (2002). Under 42 U.S.C. § 1997e(a), the court is directed to dismiss a suit brought with respect to prison conditions if the court determines that plaintiff has failed to exhaust his administrative remedies. *Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 532 (7th Cir. 1999).

The Seventh Circuit recently addressed the issue of the procedures a prisoner must follow when using the administrative process and stated:

> [U]nless the prisoner completes the administrative process by following the rules the state has established for that process, exhaustion has not occurred. Any other approach would allow a prisoner to 'exhaust' state remedies by spurning them, which would defeat the statutory objective of requiring the prisoner to give the prison administration an opportunity to fix the problem--or to reduce the damages and perhaps to shed light on factual disputes that may arise in litigation even if the prison's solution does not fully satisfy the prisoner.

*Pozo v. McCaughtry*, 286 F.3d 1022, 1023-24 (7th Cir. 2002). In short, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Id.* at 1025.

Dobbs first wrote an emergency grievance on August 4, 2000, in regard to the incidents at Joliet. (Plaintiff's complaint, Exhibit 1; Plaintiff's deposition, p. 47.) He gave the grievance to Correctional Officer Foote to mail on August 8, 2000. However, the grievance was returned to Dobbs on August 9, 2000, requesting a voucher for payment of postage. (Plaintiff's complaint, Exhibit 2.) Dobbs claims that the officers would not give him any vouchers.

Dobbs filed an emergency grievance, dated October 21, 2000, directly to the Administrative Review Board. In this grievance he states that he mailed the August 4, 2000, grievance after it was returned to him, and the ARB returned the August 4, 2000, grievance on August 21, 2000. (Plaintiff's Exhibit 11.) He states that he then forwarded the August 4 grievance to his counselor on September 9, 2002. The counselor appears to have responded that the grievance had been sent back to Dobbs. He states that he mailed the August 4 grievance back to Springfield and as of October 21, 2000, he had not received a response. (*Id.*)

Accepting Dobbs's handwritten statements as to the events as true, even though they are not supported by any objective evidence, such as a copy of the voucher showing when he actually mailed the August 4, 2000, grievance, he still did not follow the procedures in place.

Dobbs was correct in sending his August 4, 2000, grievance to the Administrative Review Board (if indeed it was sent as there is no documentation that Dobbs mailed the grievance after it was returned to him for a voucher). Section 504.870 (a)(3)[3] provides that committed persons shall submit grievances directly to the Administrative Review Board when grieving other issues except personal property issues which pertain to a facility other than the facility where the committed person is currently assigned. 20 Ill. Adm. Code 504.870(a)(3) (Amended at 22 Ill. Reg. 1206, effective January 1, 1998). Because the alleged lack of medical care occurred at Joliet and Dobbs was then incarcerated at Menard, he was required to send this grievance directly to the Administrative Review Board.

However, Dobbs submitted an emergency grievance, and the administrative regulations did not provide for direct review of emergency grievances by the Administrative Review Board. Procedures for emergency grievances are contained in Sections 504.840 and 504.850. In brief, emergency grievances are to be filed directly with the Chief Administrative Officer of the institution. If the CAO determined that there was a substantial risk of imminent personal injury or other serious or irreparable harm, then the grievance would be handled on an emergency basis. The CAO was to respond to the committed person within three days, whenever possible. If, after receiving this response, the committed person did not feel the issue had been satisfactorily resolved, then he could appeal to the Director. Copies of the Grievance Officer's report and the Chief Administrative Officer's decisions were to be attached.

Dobbs appears to have sidestepped these procedures when he attempted to file an emergency grievance with the Administrative Review Board about events that had occurred almost six months

---

[3] All references to the Illinois Administrative Code are to the regulations in effect when the events of the complaint occurred from January through April 2000.

-6-

previously at Joliet. In fact, the ARB returned a grievance which it had received on November 27, 2000, to Dobbs with a notation that "You only complicate/confuse issues by trying to file grievances as emergency when they are not!" (Plaintiff's complaint, exhibit 13.) Although defendants Idowu and Sood claim that this was in response to the August 4 grievance, the court has found nothing in the record to support this claim.[4]

The problem the court has with this record is that neither party has provided it with any documentation as to what actually happened with the August 4 grievance. Copies of the mail logs from Menard could have show if, and when, Dobbs mailed the grievance to the ARB. Records that the ARB is required to keep should have shown if this grievance was received and how the ARB responded to it. It is possible that even though Dobbs termed it an emergency grievance that the ARB may have treated not as an emergency but as a grievance that should have been filed directly with the ARB. The prison officials were in the better position to obtain these records to illustrate definitively what happened with this grievance. However, although they argued that Dobbs had not exhausted, they did not properly support this argument. Rather than asking the parties to further brief this argument, the court will address the merits of Dobbs's claim because, as discussed below, he has not demonstrated that any defendant acted with deliberate indifference to his serious medical needs.

## B. Deliberate Indifference to Serious Medical Needs

### 1. Defendants Dr. Kul B. Sood and Dr. Olumuyiwa Idowu

The major issue here is whether the defendant physicians can be held liable for deliberate indifference because they exposed Dobbs to "a sufficiently substantial risk of serious damage to his future health." *Farmer v. Brennan*, 511 U.S. 825, 843 (1994), quoting *Helling v. McKinney*, 509 U.S. 25 (1993).

---

[4]/Dobbs filed another emergency grievance, dated October 8, 2000, to the ARB, which was received by the ARB on October 13, 2000. In it, he complains mainly about events at Stateville in 1999 but he also refers to the events occurring in February 2000 at Joliet. The ARB returned the grievance to Dobbs noting that he had submitted outside "the timeframe outlined in Department Rule 504; therefore, issue will not be addressed further."

Dobbs argues that he was denied necessary medical care when defendants Drs. Idowu and Sood refused to provide Dobbs with requested treatment and supplies during January through March 2000. He claims that the conduct of the defendant physicians [hereinafter "the doctors"] demonstrates deliberate indifference to his condition.

According to Dobbs's complaint and his response, he suffered a spinal injury as a result of a gunshot wound to his lower back in 1987. This spinal injury has caused him to suffer physical impairment, including "neuropathy paralysis," which has impaired the use and feeling in his left leg and foot, as well as chronic lower back pain. Defendants do not dispute that Dobbs suffers from these problems.

Failure to provide medical care to a prisoner is a violation of the Eighth Amendment only when the prisoner can establish deliberate indifference to a *serious* medical injury. *Estelle v. Gamble*, 429 U.S. 97, 108 (1976). Thus, two requirements must be met. First, the deprivation alleged must be serious. Second, the prison official must have a state of mind described as "'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prison doctor or other official is deliberately indifferent when he or she knows about but disregards an excessive risk to a prisoner's health by failing to take reasonable measures to abate that risk. *Id.* at 847. But there is no violation of the Constitution every time a prison doctor or other official makes a mistake in diagnosing or treating a prisoner. Thus, a plaintiff must show that a defendant acted with reckless disregard toward the prisoner's serious medical need by inaction or woefully inadequate action.

The Seventh Circuit recently set forth the principles for determining whether the Eighth Amendment's prohibition against cruel and unusual punishment has been violated because of deliberate indifference to a serious medical need.

> The Eighth Amendment protects prisoners from deliberate indifference to a serious injury or medical need. See *Zentmyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir. 2000) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). ... To prevail the detainee must satisfy an objective and a subjective element, namely that: (1) an objectively serious injury or medical need was deprived; and (2) the official knew that the risk of injury was substantial but nevertheless failed to take

> reasonable measures to prevent it. *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999). Under the first prong, an objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Zentmyer*, 220 F.3d at 810 (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). ... Under the second prong, it must be shown "that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997) (*citing Farmer v. Brennan*, 511 U.S. 825, 840-42, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Neither negligence nor even gross negligence is a sufficient basis for liability; rather, liability attaches only if the conduct is intentional or criminally reckless. *See Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). Deliberate indifference can arise by a failure to provide prompt treatment for serious medical needs or by intentionally interfering with treatment once prescribed. *See Estelle*, 429 U.S. at 104-05.

*Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) (rehearing en banc denied).

These standards apply both to prison guards and to medical personnel. However, the dissatisfaction or disagreement with the method of treatment or the inability to effect a final cure does not suggest that those who treat an inmate exhibited deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126 (1997); *Estate of Cole v. Fromm*, 94 F.3d 254 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir.), *cert. denied*, 484 U.S. 935 (1987). Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference. *Estelle* at 107; *Cole* at 261. A plaintiff can show that medical professionals disregarded a serious medical need "only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998).

A careful examination of the record demonstrates that the doctors were not deliberately indifferent to the risk that Dobbs would suffer serious medical injury.

First, Dobbs's ailments do not appear to represent a serious medical need. Although Dobbs may have suffered discomfort because he lacks some feeling in his left leg and foot, and on occasion the skin on his feet bleed as a result of having long toenails, these do not appear to be serious medical problems that implicate Eighth Amendment issues. "[Not] every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim."

*Guttierez v. Peters*, 111 F.3d 1364, 1372 (1997). Although Dobbs has alleged that he feared that infection would result from the lacerations on his feet, he does not allege that any infection in fact resulted. *See also Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (an objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention).

Even assuming that Dobbs had a serious medical need, the doctors and other medical personnel treated him appropriately.

Dobbs's allegations against the doctors fall into two categories: (1) his claim that they refused to issue or assist him in obtaining thermal clothing and (2) his claim that they did not treat his bleeding foot properly.

### a. The Thermal Clothing

Nurse Garbs first saw Dobbs at Joliet on January 19, 2000 during the intake process. She issued Dobbs a low-gallery permit effective January 19, 2000, through April 19, 2000. (Defendants' Exhibit B, pp. 1-2.) Dobbs asked to see a doctor on January 24, 2000, regarding "certain medical issues." (*Id.* p. 3.) Diane Schwartz, a nurse practitioner, examined Dobbs on January 26, 2000, and requested that Dobbs be given socks, thermal underwear and a blanket. (Defendants' Exhibits B and D.)

As noted by Dr. Sood in his affidavit, this request was not a prescription. (Defendants' Exhibit D ¶ 8.) Dr. Sood further stated that the healthcare unit did not maintain any clothing other than a small supply of cotton blankets, to be dispensed to an inmate who was allergic to the standard-issue wood blankets. (*Id.* ¶ 5.) Although personnel from the healthcare unit could attempt to assist an inmate with a request for additional clothing, the decision to issue additional clothing was handled by the Department of Corrections through the clothing room. (*Id.* ¶ 6.) Moreover, Dobbs had made a previous request for thermal clothing and gym shoes at Menard Correctional Center in November 1999, and was informed that his request needed to be addressed to the superintendent of the cell house. (Plaintiff's Complaint, Exhibit 49.) Dobbs was informed that the thermal top was an item

to be purchased at the commissary. (Plaintiff's Complaint, Exhibit 70.) Dobbs was also informed by his counselor at Joliet on February 4, 2000, that thermal clothes could be purchased at the commissary, but were not prescribed through the healthcare unit. (Plaintiff's Complaint, Exhibit 14.)

Dobbs first saw Dr. Idowu on February 8, 2000. (Defendants' Exhibit B, p. 6.) Dobbs asked for thermal clothing, and Dr. Idowu noted that she would check on the request. Dobbs made no further requests for thermal clothing at his next three visits with Dr. Idowu on February 29, 2000 (Defendants' Exhibit B, p. 9); March 7, 2000 (*Id.*, p. 11); and April 11, 2000 (*Id.*, p. 11).

Dobbs saw Dr. Sood one time on February 19, 2000. He requested Dr. Sood to follow the recommendations of other doctors and issue thermal underwear, blankets, and socks. (Defendants' Exhibit C, Plaintiff's deposition, p. 54.) Dr. Sood responded that he would need to review Dobbs's file. (*Id.*, p. 56.) Dobbs had no further contact with Dr. Sood (Defendants' Exhibit B), who resigned as Medical Director of Joliet effective March 15, 2000. (Sood's Affidavit, Exhibit D.)

In March 2000, Dobbs attempted to purchase thermal pants and a thermal shirt at the commissary, along with many other items, including a color TV and other audio-visual equipment, various cosmetic items, and foodstuffs such as candy bars. (Plaintiff's Complaint, Exhibit 18.) The commissary request was denied because he had asked for too many items. Dobbs never made a second request from the commissary at Joliet just for the thermal clothing. (Plaintiff's deposition, Exhibit C, p. 31.)

In response, Dobbs states that Diane Schwartz was a staff physician at Joliet and when she examined him on January 26, 2000, she diagnosed neuropathy and other symptoms. She then wrote a prescription and a memorandum for Dobbs to be given an extra blanket, thermal underwear, and socks. He therefore claims that neither Dr. Sood nor Dr. Idowu followed Dr. Schwartz's recommendations.

This claim can be easily dispensed with. Ms. Schwartz was a nurse practitioner, and Dobbs has offered nothing to support his elevation of her to the status of staff physician. *See* Defendants' Exhibit B, Affidavit of Diana Moore, Human Resources Representative for Stateville Correctional

Center, ¶ 3.f. Even assuming she was a doctor, the mere disagreement of treatment among professionals do not give rise to deliberate indifference. *Estate of Cole*, 94 F.3d at 261. Moreover, beneath "PRESCRIPTION ORDER", it reads: "Please give I/m extra blanket socks & thermal underware [sic] for medical reasons." Although a request to give Dobbs extra blankets, socks, and thermal underwear was made, it clearly was not mandated.

Dobbs next argues that because Drs. Sood and Idowu admit that cotton blankets were available in the healthcare unit for those inmates who were allergic to wool, they therefore could have issued him an extra blanket. Dobbs has admitted that he was not allergic to wool. (Plaintiff's deposition, p. 65.) As Dr. Sood stated in his affidavit, the healthcare unit keeps only a limited supply of cotton blankets for those inmates who are allergic to wool.

Dobbs avers that Drs. Sood and Idowu agreed to assist him in obtaining the extra blanket and thermal clothing; however, they did not follow through. Even assuming that the doctors did not assist Dobbs in getting the clothing, he was informed on several occasions that he could purchase these items at the commissary. Dobbs was given an opportunity to purchase these items at the commissary in March 2000. However, he did not follow the procedures.

Trying to get these items of clothing on a prescription basis is nothing more than an attempt by Dobbs to obtain this clothing for free rather than purchasing the items at the commissary and do not demonstrate deliberate indifference on the part of the doctors.

**b. The Bleeding Toes**

On February 15, 2000, Dobbs's feet became cold while in the yard. When he went back to his cell, he saw that his toes were bleeding from a toenail cutting into another toe. He asked to see a doctor, and Sergeant Burzinski told him to put in a sick call clip. (Exhibit C, Plaintiff's deposition, pp. 37-40.) On February 16, Dobbs was escorted to the health care unit. (*Id.*, p. 39, 42-42.) Dobbs's toenails were trimmed and cleaned with peroxide. (*Id.*, p. 51.) This was the first time that Dobbs's toes had bled while at Joliet. They did not bleed again nor did his toenails cut into his skin while he was at Joliet. (*Id.*, pp 61-62.)

When Dobbs saw Dr. Idowu on February 29, 2000, he complained of a painful toenail on his right big toe, but not the same toe that had bled on February 15, 2000. Dr. Idowu diagnosed an ingrown toe nail and referred him to podiatry. (Defendants' Exhibit B, p. 9.)

Dobbs saw Dr. Idowu again on March 7, 2000, and complained about the ingrown toenail. Dr. Idowu noted that Dobbs had been seen a week ago and referred to Dr. Sood. (*Id.*, p. 11.)

In response, Dobbs asserts that he requested Dr. Idowu to clip his nails on February 8, 2000, but the request was denied. However, nowhere on the medical record to which Dobbs cites (Plaintiff's Exhibit F, p. 113) has Dr. Idowu noted a request from Dobbs to have his nails clipped. She notes that he requested long underwear, extra socks and blanket and that he had a fungal nail infection.

Further, according to Dobbs, when he was seen by Dr. Idowu, she responded to his complaints by giving him a low bunk/low gallery permit. Although neither she nor Dr. Sood provided all the treatment Dobbs requested, such as clipping his toenails, the doctors were not recklessly disregarding a serious medical need. At most, the doctors' treatment was negligent.

The facts in this case resemble those in *Snipes v. DeTella*, 95 F.3d 586 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126, where an inmate had problems resulting from an injury to his toe. He experienced bleeding and pain from the injury, and when he saw the prison doctor, he received initial treatment, followed by removal of the toenail. The inmate complained about the medical attention he received, including the doctor's failure to anesthetize his toe before removing the toenail. The Seventh Circuit held that the doctor's treatment did not constitute cruel and unusual punishment. The court stated, "What we have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner." *Id.* at 591. The court viewed the question in *Snipes* as one of tort law, rather than constitutional law, stating that "the Constitution is not a medical code that mandates specific medical treatment." *Id.* at 592. Similarly, the doctors here chose to treat Dobbs's medical problems in a particular manner, and although Dobbs

was unhappy with that treatment, Dobbs has not shown that the doctors acted with reckless disregard to any serious medical needs.

Although the doctors might have provided additional treatment to this Dobbs, their conduct constitutes, at worst, medical malpractice rather than deliberate indifference. In another ruling by the Seventh Circuit, *Forbes v. Edgar*, 112 F.3d 262 (7th Cir. 1997), the inmate complained that the treatment she received for tuberculosis was not the preferred treatment recommended by the Center for Disease Control. The court noted that the approach taken by the prison officials was satisfactory, stating, "One thing which has long been clear in our Eighth Amendment cases is that the amendment is not coterminous with a medical malpractice claim [citations omitted]. ... Ordinary malpractice does not rise to the level of an Eighth Amendment claim. *Vance v. Peters*, 97 F.3d 987 (7th Cir. 1996)." *Id.* at 266. Dobbs's impairment resulting from the gunshot wound is an unenviable one, but the claims that Dobbs has made against the doctors do not rise to the level of deliberate indifference stated in the precedents of either the U.S. Supreme Court or the Seventh Circuit.

**2. Defendants James Burzinski, Keith Lee, Jim Utley, Monica Becker, Arthur Gillen, and Samantha Franklin**

**a. Delay in Medical Treatment**

Dobbs claims that Burzinski and Lee were deliberately indifferent to his serious medical needs because they did not take him for immediate medical attention when his toes began bleeding.

On February 15, 2000, Dobbs was in the exercise yard at Joliet when his leg began to hurt. (Plaintiff's deposition, p. 37.) He sat down and took off his shoes and discovered that his toenails were cutting into his feet. (*Id.* p. 38.) He told Lee and showed him his feet. (*Id.* p. 38.) Lee went to Burzinski, the sergeant in charge, for instructions. (*Id.* p. 38.) Burzinski allegedly told Lee to put Dobbs on sick call to see medical personnel. (*Id.* p. 38.) Dobbs put in a sick call slip. (*Id.* p. 39.)

On February 16, 2000, Dobbs was escorted to the infirmary where his toenails were trimmed and cleaned. (*Id,* p. 39 and 51.) Dobbs's feet had never bled prior to February 15, 2000, and have not bled since his toenails were trimmed on February 16, 2000. (*Id.* p. 61.)

-14-

In response, Dobbs asserts that after he had shown defendants his bleeding feet, he was forced to walk to the chow hall, causing more damage to his injury, rather than being taken for immediate medical attention. He adds that he complained to Officer Lackey[5] during the 3 to 11 shift but did not receive any medical attention.

A delay in necessary treatment can establish deliberate indifference, but only if "verifying medical evidence" exists to show how the delay adversely affected a patient's condition. *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (emphasis and internal quotation omitted). Here, Dobbs has not introduced medical evidence to show the effect--if any--of the delay on his condition. Without such evidence, Dobbs cannot overcome summary judgment on his medical-care claim in regard to his bleeding foot..

### b. Denial of Thermal Clothing

Dobbs claims that defendants Utley, Becker, Gillen, Franklin and Burzinski refused to issue thermal clothing to Dobbs.

While Dobbs was housed at Menard, he had been put on commissary denial for violating numerous prison rules. The commissary denial follow through to his transfer to Joliet on January 19, 2000. (Plaintiff's deposition, p. 7 & 9.) When an inmate is on commissary denial, he may spend up to $30 a month for personal items. (*Id.* p. 14.) The inmate is not permitted to buy certain items that other inmates are permitted to buy. (*Id.* p. 14.)

On January 26, 2000, Dobbs complained to Dianne Schwartz, that his leg was cold because of a prior medical condition. (*Id.* pp 41 & 49.) Ms. Schwartz, who was a physician's assistant (Exhibit B., Moore affidavit at 3f.), wrote a permit to allow Dobbs to receive thermal clothing from the commissary. (Plaintiff's deposition, p. 49.)

Dobbs did not formally request the thermal clothing until March 20, 2000, when he placed a commissary order asking for numerous items. (Exhibit C. Commissary Order dated March 21,

---

[5] Correctional Officer Lackey was dismissed from this suit without prejudice by order of this court on January 14, 2002, for failure to serve him within 120 days of the filing of the complaint.

2000.) Samantha Franklin denied the request for special trade because Dobbs had asked for too many items. (Plaintiff's deposition, p. 30.) Dobbs never sent a follow up commissary request requesting the items the was authorized to buy, that is, the thermal clothing. (Plaintiff's deposition, p. 31.)

Dobbs possessed a wool blanket, sheets, a hat, towels, a rug, and a heavy winter coat. (Plaintiff's deposition, p. 22.) Although Warden Mote and Utley allegedly told him he could not wrap the rug around his leg (Plaintiff's deposition, p. 19), he was never told that he could not use any of his other articles of clothing or the blanket or towels to insulate his leg from the cold. (Plaintiff's deposition, pp. 19, 24, 7, 64.)

It is obvious from this record that, even though Dobbs was in commissary denial, he had the means to procure the thermal clothing. He admits that he was allowed up to $30 a month to purchase certain items at the commissary. Although neither party has identified what Dobbs actually bought with his $ 30 a month, he could have used part or all of this money for thermal clothing because the Illinois Department of Corrections is obligated to provide him with the necessities of life. He apparently decided not to allocate part or all of the money to the thermal clothing. Moreover, when he was given an opportunity for special trade, he abused the privilege by requesting too many items, including items such as a TV and candy bars.

Dobbs also had sufficient clothing, a blanket, sheets, towels, and the like to protect his leg from the cold. Although thermal clothing might have been less bulkier than layering the clothing he possessed, he was not without means to protect his leg and foot from the cold.

The court accordingly finds no deliberate indifference on the part of defendants in not providing Dobbs with thermal clothing.

### IV. Conclusion

For the foregoing reasons, the court grants defendants' motions for summary judgment. The Clerk is directed to enter judgment in favor of defendants Dr. Kul B. Sood, Dr. Olumuyiwa Idowu,

Jim Utley, Monica Becker, Arthur Gillen, Samantha Franklin, James Burzinski, and Keith Lee, and against plaintiff Tracy Darnell Dobbs pursuant to Fed. R. Civ. P. 56.

If Dobbs wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Rule 4(a)(4), Fed. R. App .P. If he does so, he will be liable for the $105 appellate filing fee. Unless he is granted leave to proceed *in forma pauperis*, he will have to pay the fee immediately. If he cannot do so, the appeal will be dismissed, but he will remain liable for the fee and it will be deducted from his inmate trust fund account in installments. *Evans v. Illinois Dept. of Corrections*, 150 F.3d 810, 812 (7th Cir. 1998). If this court finds that appeal is not taken in good faith, and the Court of Appeals agrees, he will not be permitted to proceed *in forma pauperis* and pay the fee in installments, but will have to pay the fee immediately or the appeal will be dismissed. 28 U.S.C. § 1915(a)(3). To avoid a finding that the appeal is not taken in good faith, a motion to proceed *in forma pauperis* on appeal should explain the grounds for the appeal. *See Hyche v. Christensen*, 170 F.3d 769, 771 (7th Cir. 1999); Fed. R. App. P. 24(a)(1)(C).

ENTER:

PAUL E. PLUNKETT
UNITED STATES DISTRICT JUDGE

DATED: 9-12-03